IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Anthony E. Hackney, ) | |
| ) | Civil Action No. 8:13-2191-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Hardees Food Systems. LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 21). In his amended complaint, the plaintiff alleges causes of action against his former employer for violation of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

## FACTS PRESENTED

The plaintiff was employed as a Regional Loss Prevention Manager by the defendant from April 23, 2001, through December 20, 2012 (doc. 21-3, pl. dep. ex. 2). As a Regional Loss Prevention Manager, the plaintiff was responsible for managing loss prevention measures in all the defendant's stores in South Carolina, North Carolina, and parts of Georgia (doc. 21-4, Sullivan dep. 16). The plaintiff was a salaried exempt employee and did not have a set schedule. His hours were dependant on the needs of the stores in his territory (doc. 21-2, pl. dep. 41-42; doc. 21-4, Sullivan dep. 25). The plaintiff was one of the top two Regional Loss Prevention Managers in the department based on statistics such as cases, dollar value, and omissions (doc. 23-2, Sullivan dep. 20).

On May 13, 2012, the plaintiff suffered a traumatic brain injury ("TBI") when he fell from a moving golf cart (doc. 21-2, pl. dep. 22). On May 14, when the defendant first received information about his injury, the company immediately approved a medical leave of absence (doc. 21-2, pl. dep. 23-24; doc. 21-3, pl. dep. ex. 3). At that point, the defendant was not aware of the details of his condition and contacted the plaintiff s wife by email (doc. 21-2, pl. dep. 25-26). On May 15, the defendant received documentation that the plaintiff had been admitted to the hospital and diagnosed with "Traumatic Subarachnoid Hemorrhage" (doc. 21-2, pl. dep. 28; doc. 21-3, pl. dep. ex. 5). The defendant maintained frequent communication with the plaintiff's wife regarding his progress. The plaintiff and his wife subsequently sent a thank you note to Chip Siegel, the defendant's Senior Vice President, Legal, expressing appreciation for the support they received from the defendant (doc. 21-2, pl. dep. 25-28; doc. 21-3, pl. dep. ex. 8).

On May 17, 2012, the plaintiff's wife e-mailed Sally Wilson-Knight, the defendant's Director of Corporate Human Resources, and reported that the plaintiff s doctor expected him to make a full recovery (doc. 21-5, Wilson-Knight decl. ¶ 3). On May 18, 2012, the defendant sent the plaintiff a letter confirming its approval of a continuous leave of absence related to his injury (doc., 21-2, pl. dep. 28-29; doc. 21-3, pl. dep. ex. 6). On or about May 24, 2012, the defendant received a Certification of Health Care Provider form signed by the plaintiff's doctor. This form indicated that the plaintiff was currently unable to work because of his condition but could return to work on June 11, 2012 (doc. 21-2, pl. dep. 33-34; doc. 21-3, pl. dep. exs. 10-11). It also provided that "if flare ups occur patient may need treatment and/or appointments," that the plaintiff would have a doctor's appointment once per week for six months, and that he would have treatment as needed. This form did not modify the plaintiff s work schedule or provide work restrictions *(id.)*.

The plaintiff also submitted a Fitness-for-Duty Release that provided that he was released to return to full duty without restrictions beginning on June 11, 2012 (doc. 21-

2, pl. dep. 33; doc. 21-3, pl. dep. ex. 10). The plaintiff returned to work on June 11, 2012 (doc. 21-2, pl. dep. 35-36; doc. 21-3, pl. dep. ex. 12). On June 13, Ms. Wilson-Knight sent the plaintiff an e-mail welcoming him back to work and asking if he had any work restrictions. (doc. 21-5, Wilson-Knight decl. ¶ 4). The plaintiff responded that he did not have any restrictions and proceeded to work without restrictions for approximately four weeks (doc. 21-2, pl. dep. 35-36).

On July 9, 2012, the defendant received a second Certification of Health Care Provider form, which was signed by the plaintiff's family physician on July 6, 2012 (doc. 21-2, pl. dep. 36-37; doc. 21-3, pl. dep. ex. 13). This form provided the following information and restrictions:

> a. Treatment for one hour two times per week for three months;
>
> b. Work restrictions: (1) no driving more than two hours per day and (2) no night driving. Frequent breaks from vision related work activities;
>
> c. Plaintiff may need to be "out of work intermittently if symptoms flare";
>
> d. Plaintiff would have a doctor's appointment one to three times per week for six months;
>
> e. Plaintiff would have occupational rehabilitation on Monday and Wednesday (prior to work if possible); and
>
> f. Plaintiff could work 8 hours per day and 5 days per week from June 11 to November 11.

(Doc. 21-3, pl. dep. ex. 13).

Ms. Wilson-Knight recalls telling the plaintiff that he could take off any time he needed for required appointments or treatment (doc. 21-5, Wilson-Knight decl. ¶ 6). The plaintiff admits that he and Ms. Wilson-Knight discussed his restrictions in an e-mail on July 9, 2012 (doc. 21-2, pl. dep. 38-39; doc. 21-3, pl. dep. ex. 14). Ms. Wilson-Knight told the

plaintiff that the defendant would accommodate his restrictions (doc. 21-5, Wilson-Knight decl. ¶ 6).

The plaintiff claims that he never received a notification from the defendant as to whether his second Certification of Health Care Provider form was approved (doc. 21-2, pl. dep. 43). The plaintiff testified in his deposition that he never requested time off for a doctor's appointment that was denied (*id.* 43-46). He claims that his absences for doctors' appointments were approved from the standpoint of the sick days he accumulated, but he was never told they were approved absences pursuant to the FMLA, and he did not seek clarification from the defendant (*id.* 39-47). According to the plaintiff, after his return to work, he took FMLA leave intermittently, including on August 21, 2012; October 12, 2012; and November 2, 2012 (pl. resp. m.s.j. at 3 (citing doc. 23-1, pl. dep. exs. 15, 16)).

As a salary exempt employee, the plaintiff was able to schedule his work around any necessary appointment or treatment without being required to formally request time off (doc. 21-5, Wilson-Knight decl. ¶ 7). In addition, the plaintiff requested and was paid sick leave when he wanted to take an entire day off from work (doc. 21-2, pl. dep. 51-54; doc. 21-3, pl. dep. ex. 16). The plaintiff's supervisor, Anne Sullivan, approved every request the plaintiff submitted to her for time off related to doctor's appointments (doc. 21-2, pl. dep. 51-54).

The defendant hired Ms. Sullivan as the Director of Loss Prevention on May 13, 2012, the same day as the plaintiff's injury (doc. 21-4, Sullivan dep. 23). Ms. Sullivan first met the plaintiff at the defendant's Regional Loss Prevention Manager meeting at its corporate office in Anaheim, California on July 17 through 19, 2012 (doc. 21-2, pl. dep. 67; doc. 21-4, Sullivan dep. 38-44).

On August 21, 2012, Ms. Wilson-Knight called the plaintiff and asked him how he was doing. The plaintiff updated Ms. Wilson-Knight on his trip to the Regional Loss Prevention meeting. He stated that the travel was "rough" but that he enjoyed the trip. He

4

said that he had not done physical therapy in three to four weeks and that it was complete for now. He said that he could drive with no problems and that he was "working with Anne [Sullivan] well." Ms. Wilson-Knight asked the plaintiff to provide a doctor's note confirming that his driving restrictions were lifted (doc. 21-3, pl. dep. 162-68 & ex. 20). Ms. Wilson-Knight followed-up with a reminder on September 10, 2012. In response, the plaintiff sent Ms. Wilson-Knight a doctor's note dated August 21, 2012, which provided that he had been able to drive without restrictions since August 6, 2012 (doc. 21-3, pl. dep. ex. 15).

On December 3, 2012, the plaintiff advised Ms. Sullivan of possible credit card skimming by an employee at a Spartanburg restaurant (doc. 21-3, pl. dep. 117-18 & ex. 25). Sergeant Tony Brown of the Spartanburg County Sheriff's Department initially contacted the defendant's District Manager, Chuck Burns, regarding the matter. Both the plaintiff and Ms. Sullivan began working together to assist Sergeant Brown with the investigation. Sergeant Brown recalled that Ms. Sullivan and the plaintiff worked well together and were both very helpful, and Ms. Sullivan treated the plaintiff in a professional manner (doc. 21-6, Brown dep. 20-22).

On December 10, 2012, the plaintiff met with Sergeant Brown outside the restaurant where the suspect worked. At approximately 8:00 a.m., Ms. Sullivan called and spoke to the plaintiff and Sergeant Brown regarding the investigation (doc. 21-3, pl. dep. 117-18 & ex. 25). Sergeant Brown and the plaintiff were planning on going to the restaurant after the call to interview the suspect. During this call, Ms. Sullivan specifically directed the plaintiff not to conduct a search of the employee (doc. 21-3, pl. dep. 118). Ms. Sullivan also told Sergeant Brown that the defendant company was not allowed to search an employee's personal property (doc. 21-4, Sullivan dep. 83-85). Ms. Sullivan was confident that the device used to obtain credit card numbers would not be at the store because the plaintiff had been there within the past few days (*id.*). Ms. Sullivan wanted to prevent any violation of policy or risk of liability to the defendant (*id.*). Ms. Sullivan was working on installing a

video camera in the drive-thru area to capture any skimming activities (*id*.). The plaintiff understood her directive and the defendant's policy prohibiting searching an employee's personal property (doc. 21-3, pl. dep. 118-19).

After the call with Ms. Sullivan, the plaintiff and Sergeant Brown proceeded to the restaurant and interviewed the suspect (doc. 21-3, pl. dep. 123-27 & ex. 25). While Sergeant Brown continued to interview the suspect in the lobby of the restaurant, the plaintiff searched the employee's work area in the drive-thru for the credit card skimming device (*id*.). When the plaintiff returned to the lobby, he engaged in a conversation with the employee, turned around and started walking to the back of the restaurant (doc. 21-3, pl. dep. 145-46). According to the plaintiff, in this conversation, he asked the suspect if she had a coat; she replied that she did, but he was not allowed to search it; and he replied in agreement that he was not allowed to search her coat (*id.* 124 & ex. 25). According to the plaintiff, he turned to walk toward the front line, and the plaintiff stood up and stated that she wanted to show him her coat (*id.* 125-26 & ex. 25). The plaintiff claims that the suspect passed him at the back of the restaurant, and he followed her to the office (*id.*). The suspect picked up her coat and showed him that there was nothing in the pockets of her coat (*id.*). These events were captured on video by the store's surveillance camera, which does not record audio. The plaintiff and the suspect returned to the lobby where the interview was terminated when the suspect refused to cooperate and said she was hiring an attorney (doc. 21-3, pl. dep. ex. 25). An arrest was never made (doc. 21-6, Brown dep. 22).

Subsequently, the plaintiff informed Ms. Sullivan that the employee did not admit to the crime and that the device was not in her work area or in her jacket. Ms. Sullivan said to the plaintiff, "[P]lease tell me you did not search her jacket" (doc 21-4, Sullivan dep. 85). Ms. Sullivan was concerned about a policy violation and possible liability from a claim by the employee (*id.* 92). The plaintiff responded that he did not search the

employee's jacket. Ms. Sullivan asked the plaintiff to submit a full report of the incident (doc. 21-3, pl. dep. 117-27 & ex. 25). The plaintiff submitted a written report explaining as follows:

> I went to the DT area and searched all around to include the drop box had the other MOD open the cash drawer to see if any device was in there. Nothing was located during my search of Hardee's property. I then returned to the table where Sgt. Brown and Katrina Thompson were and asked if she had a coat. She stated that her coat was in the office and asked if I was allowed to search it. I stated that I was not asking to search her coat, only inquiring if she had one. She then got up and said she wanted to show me that nothing was in her coat. I told her there was no need in that, but she insisted so, I followed her to the office where she removed her coat from the office chair and proceeded to turn her pockets inside out. At no time did I touch her coat or take it into my possession. She then returned to the table where Sgt. Brown was located and told him she no longer wished to speak to him that she was going to contact an attorney. Sgt. Brown ended the interview and proceeded to a nearby table.

(Doc. 21-3, pl. dep. ex. 25).

Ms. Sullivan compared the plaintiff's report to the video from the restaurant's surveillance camera and determined that there was a conflict (doc. 21-4, Sullivan dep. 87-88 & ex. 8; doc. 21-7, video). Ms. Sullivan prepared a report dated December 17, 2012, explaining her review of the evidence and outlining the contradictions. Ms. Sullivan determined that the plaintiff could not have had the conversation he allegedly had with the employee in the three seconds between the time he approached the employee and when he turned to walk away toward the office where the jacket was located. In addition, the plaintiff stated that the employee insisted on showing him her jacket and that she stood up and he followed her. However, the video showed that the plaintiff approached the employee, spoke to her for three seconds, turned to walk away, turned the corner of the lobby, that the employee hesitated, and then finally stood up and followed the plaintiff to the back of the restaurant. The plaintiff was out of the sight of the lobby video camera before

the employee stood up to follow him. Based on this evidence, Ms. Sullivan determined that the plaintiff conducted an improper search of the employee's personal property, violated her directive not to search the employee, and provided false information in his report (doc. 21-4, Sullivan dep. ex. 8).

Ms. Sullivan discussed the plaintiff's conduct with Ms. Wilson-Knight who agreed that the plaintiff's conduct warranted termination (doc. 21-4, Sullivan dep. 115 & ex. 10; doc. 21-5, Wilson-Knight dec. ¶ 11). Ms. Wilson-Knight also reviewed the conduct with Ms. Sullivan's supervisor, Chip Seigel (Senior Vice President, Legal), who agreed that termination was appropriate (doc. 21-5, Wilson-Knight dec. ¶ 11.) On December 20, 2012, Ms. Sullivan and Ms. Wilson-Knight met with the plaintiff. The plaintiff reiterated that the employee insisted that he see her jacket and that she led him back to the office. Ms. Sullivan then informed the plaintiff that she had reviewed the video and that it showed that the employee hesitated before following the plaintiff. The plaintiff responded that there was a lot going on that day and that he followed her because he wanted to see what was in the jacket pockets. The plaintiff also stated that he followed her because of a possible concern that she could have a weapon, which he did not mention in his report. Ms. Sullivan terminated the plaintiff's employment for violating company policy and providing false information in his report (doc. 21-4, Sullivan dep. 115 & ex. 10: doc. 21-5, Wilson-Knight dec. ¶¶ 12-13 & attach. D, E).

In his deposition, Sergeant Brown was questioned regarding the events on December 10, 2012, when he and the plaintiff went to the restaurant to interview the employee suspected of skimming credit cards :

> A. From what I can remember, I continued to talk with [the employee] a little bit. And she -- the coat come up. I believe she's the one that brought up the subject about the coat. Let me refer to my notes to make sure that I'm correct. She stated she did have a coat, it was hanging up in the back of the office, or somewhere in the back.

8

> Q. Now, do you recall if Mr. Hackney requested to search that coat?
>
> A. No. She asked us, she said, do y'all have a right to search it. And I believe he responded --according to my notes here -- I believe he responded that no, he didn't ask to search it, he just asked if she had one.
>
> Q. Now, at any time, did Mr. Hackney and Katrina leave the area to go retrieve that coat?
>
> A. She went -- she got up, she went back, something along the line, she said, I'll show you, or you can look, or something. She offered to show this coat to us. And yes, Hackney did go back with her.

(Doc. 23-3, Brown dep. 13-14).

> He further testified:
>
> Q. Do you recall that at any time Mr. Hackney instructed Katrina to remove any article of clothing for a search?
>
> A. No, I do not remember that at all.
>
> Q. Do you remember Plaintiff demanding to search Katrina at all?
>
> A. No, I don't remember that at all.

(*Id.* 15).

After Sgt. Brown reviewed the surveillance video of the incident, he testified as follows:

> Q. All right. And if Mr. Hackney said that he followed [the suspect] to see the jacket, your not aware from looking at this video, at any point, him following her?
>
> A. No. And I was wrong on that, too. I will make that clear, too. Obviously, I was wrong on that part, too, because the video clearly shows.

(Doc. 30-1, pl. dep. 27). Sergeant Brown admitted that the video evidence shows that the plaintiff led the employee to the back of the restaurant (*id*. 24, 27). Sergeant Brown also

9

admitted that the video shows that there was not "much time" for the plaintiff to have the conversation with the employee that he alleges he had in his statement (*id*. 24-27). After viewing the video, Sergeant Brown admitted that the conversation he recalled about the jacket could have occurred between him and the employee prior to the plaintiff coming back from the drive-thru (*id.* 25-27).

> The policy of the defendant regarding workplace searches states:
>
> Employees should have no expectation that any Company property is private and for their exclusive use. Lawful inspection and surveillance may be conducted at any time at the discretion of the Company. The company may conduct searches and inspections of any Company property.
>
> It is a violation of Company policy for any employee or manager to initiate or participate in any search of a person that involves requesting or demanding the removal of any article(s) of clothing. Furthermore, any request or direction to initiate or participate in any such searches by any authority including law enforcement must be refused and a call immediately placed to your supervisor and the Human Resources Department.

(Doc. 23-2, Sullivan dep. ex. 9).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and

ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### *FMLA*

In his amended complaint, the plaintiff alleges that the defendant "selected Plaintiff for termination because of his serious health condition of which Plaintiff had taken qualifying leave, and/or because he intended to take leave that was protected by the FMLA in the near future" and "interfered with and denied Plaintiff rights to leave and other rights under the FLMA" (doc. 14, amend. comp. ¶¶ 30-31). Accordingly, it appears that the plaintiff has alleged both interference and retaliation in violation of the FMLA in the amended complaint. The defendant argues that both claims fail (doc. 21-1, def. m.s.j. at 23-27). However, in his response to the motion, the plaintiff addresses only the retaliation claim (*see* doc. 23, pl. resp. m.s.j. at 7-14). Accordingly, it appears the plaintiff has abandoned any FMLA interference claim, and thus summary judgment should be granted as to the FMLA interference claim alleged in the amended complaint.

11

With regard to the plaintiff's FMLA retaliation claim under 29 U.S.C. § 2615(a)(2), because such claims are analogous to Title VII retaliation claims, they can be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Nichols v. Ashland Hosp. Corp*., 251 F.3d 496, 502 (4th Cir.2001). The plaintiff bears the burden of making a *prima facie* showing "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to his protected activity." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998). If he makes this *prima facie* showing, then the defendant bears the burden of offering a nondiscriminatory explanation for its decision to terminate the plaintiff's employment, and, thereafter, the burden would return to the plaintiff to show that the defendant's' "proffered explanation is pretext for FMLA retaliation." *Nichols*, 251 F.3d at 502.

The undersigned will assume for purposes of this motion that the plaintiff can set forth a *prima facie* case of FMLA retaliation. The defendant has proffered a legitimate, nondiscriminatory reason for terminating the plaintiff's employment - that he violated the defendant's policy by searching the employee's jacket and falsified his report of the incident. Accordingly, "the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.' The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (citations omitted).

The plaintiff first contends that "being fired within six weeks of his last FMLA protected absence" is evidence of pretext (doc. 23, pl. resp. m.s.j. at 11). The plaintiff argues that the court should consider the proximity between his termination from employment and his last date of intermittent FMLA leave rather than his initial continuous

absence.[1] However, as argued by the defendant, the plaintiff's argument fails because he has not provided any evidence that the dates he now identifies as intermittent FMLA leave were actually FMLA qualified leave dates or that the defendant knew that they were FMLA related absences. The plaintiff alleges that his absences on August 21, 2012; October 10-12, 2012; and November 2, 2012, were intermittent FMLA absences related to his original injury (doc. 23, pl. resp. m.j. at 9-10). However, the plaintiff solely cites to the absence notification forms he submitted requesting paid sick leave on these dates (*id.* at 3, 9 (citing doc. 23-1, pl. dep. exs. 15, 16)). These forms state only that the absences were for "sick time" and do not provide the defendant any information to suggest that the absences were related to his original FMLA leave (doc. 23-1, pl. dep. 16). The plaintiff did not submit any information to the defendant suggesting that the dates were FMLA leave and never submitted any doctor excuse. The defendant approved the absences as paid sick time and did not require any explanation or medical documentation regarding the absences (*id.*). Based upon the foregoing, the undersigned finds that the temporal proximity (approximately six weeks) between the plaintiff's last approved sick leave and his termination from employment is not evidence of pretext in this case.

The plaintiff further argues that pretext can be established "by comparing the Defendant's claim that Plaintiff was fired for conducting an unlawful search with the actual video of the incident" (doc. 23, pl. resp. m.s.j. at 11).[2] The plaintiff contends that the difference in his report and the video is that the employee suspect passed him after they

---

[1] After his injury, the plaintiff returned to work on June 11, 2012, and he was terminated from employment some seven months later on December 20, 2012.

[2] The plaintiff has apparently abandoned his other allegations of pretext outlined in the amended complaint wherein he complained that Ms. Sullivan treated him differently than all other Regional Loss Prevention Managers (doc. 14, amend. comp. ¶ 10). The plaintiff does not argue in his response to the motion to for summary judgment that any of the three decisionmakers (Ms. Sullivan, Ms. Wilson-Knight, and Mr. Seigel) involved in his termination had any discriminatory animus toward his FMLA leave nor his alleged disability.

13

walked through the lobby and the cooking area to turn the corner to the office (where they go off-camera). However, as pointed out by the defendant, this is still not consistent with his report that "She then got up and said she wanted to show me that nothing was in her coat. I told her there was no need in that, but she insisted so, I followed her . . . ." (*compare* doc. 21-3, pl. dep. 123-127 *with* doc. 21-3, pl. dep. ex. 25). The video submitted by the defendant in support of summary judgment shows the plaintiff approaching the employee suspect in the lobby of the restaurant at 9:34:49 a.m. At 9:34:51, the plaintiff begins talking to the employee, and approximately three seconds later, he turns away from the employee at 9:34:54 and begins walking toward the office. The employee follows at approximately 9:35:00. The video shows the plaintiff walk through the front area of the restaurant and the kitchen with the employee several steps behind him. The video shows the employee enter the office at approximately 9:35:19 with the plaintiff remaining off-camera. The employee turns the pockets of her jacket inside out showing it to the plaintiff, who remains off-camera. She then leaves the office at approximately 9:35:51. The video then shows the plaintiff follow the employee back through the kitchen and front area of the restaurant and return to the lobby (doc. 21-7, video; *see also* doc. 21-3, pl. dep. ex. 30). The plaintiff admits that he initiated the discussion about the jacket with the employee with the hope that it would lead to a search of the coat by Sergeant Brown (doc. 21-3, pl. dep. 126-27).

The undersigned finds that the video evidence supports the defendant's reasonable belief and perception that the plaintiff conducted a search in violation of the defendant's policy and then provided false information in his report. The video supports Ms. Sullivan's determination that the plaintiff could not have had the conversation he alleged he had with the employee in the three seconds between when he approached the employee in the lobby and when he turned and walked away toward the officer where the jacket was located. The video also supports Ms. Sullivan's finding that the employee hesitated for some six or seven seconds after the plaintiff began to walk toward the office, which

contradicts his report that the employee "insisted" that she show the coat to him and that he followed her (*compare* doc. 21-7, video *with* doc. 21-3, pl. dep. ex. 25).

The plaintiff relies on the testimony of Sergeant Brown to challenge the defendant's termination decision. The plaintiff claims that Sergeant Brown corroborates his description of the events, which he alleges proves he did not engage in the misconduct for which he was terminated (doc. 23, pl. resp. m.s.j. at 11-12). Prior to watching the video of the incident, Sergeant Brown initially recalled that the employee offered to show them her coat, and the plaintiff "did go back with her" (doc. 23-3, Brown dep. 13-14). However, after reviewing the video, Sergeant Brown testified that he was not aware of the plaintiff at any point following the employee (doc. 30-1, Brown dep. 24, 27). Sergeant Brown also admitted that the video shows that there was not "much time" for the plaintiff to have the conversation with the employee that the plaintiff alleges he had in his report (*id*. 24-27). After viewing the video, Sergeant Brown admitted that the conversation he recalled about the jacket could have occurred between him and the employee prior to the plaintiff coming back from the drive-thru (*id.* 25-27).

The plaintiff also argues that the defendant did not conduct a full investigation because it did not interview Sergeant Brown prior to making the termination decision, which evidences pretext (doc. 23, pl. resp. m.s.j. at 12-13). However, as argued by the defendant, there was no reason to interview Sergeant Brown when the video evidence was clearly contrary to the plaintiff's report. Importantly, the plaintiff was specifically told by Ms. Sullivan prior to the interview not to search the employee suspect, and the plaintiff admits that he mentioned the jacket with the hopes that it would be searched (doc. 21-3, pl. dep. 118, 126-27). Moreover, even if the defendant had interviewed Sergeant Brown as the plaintiff suggests and had reviewed the video, it is clear that Sergeant Brown would have confirmed what the defendant had already determined - that the plaintiff led the suspect to the back of the store and that the conversation that the plaintiff alleges occurred that

initiated the search likely could not have occurred. The undersigned finds that the defendant's failure to interview Sergeant Brown is not evidence of pretext as the defendant conducted a thorough investigation by interviewing the plaintiff, having him submit a written report, reviewing the video evidence, having the evidence reviewed by three management officials who all agreed the evidence warranted termination, and giving the plaintiff a final opportunity to explain the discrepancies.

The plaintiff also relies on Sergeant Brown's opinion that he did not believe that the plaintiff conducted a "search" of the suspect employee (doc. 23, pl. resp. m.s.j. at 12) (citing doc. 23-3, Brown dep. 31 ("Q: [A]t any time in that video, did Plaintiff conduct a search of [the employee suspect]?  A: I did not see it in the video at all, no , sir.")). Importantly, when determining whether an articulated reason is pretextual, "[i]t is the perception of the decision maker which is relevant." *Tinsley v. First Union Nat 'l Bank*, 155 F.3d 435, 445 (4th Cir. 1998), *overruled on other grounds by Nat 'l R.R. Passenger Corp., v. Morgan*, 536 U.S. 101, 105 (2002). The United States Court of Appeals for the Fourth Circuit has ruled that it is not the court's "'province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)).  As argued by the defendant, Sergeant Brown was not aware of the defendant's search policy and is not in a position to determine whether the plaintiff's conduct was in violation of the company's policy (doc. 30-1, Brown dep. 17).  As noted by the defendant, Sergeant Brown further testified that simply looking at a suspect's clothing for a skimming device is a search and that a search can be initiated voluntarily or involuntarily (*id.*).

The plaintiff argues that it is "up to a jury to evaluate the facts and determine whether the decision-makers actually believed the proffered reason or whether it considered his usage of FMLA leave as a factor in deciding to fire [him]" (doc. 30, pl. resp. m.s.j. at 14).

The plaintiff cites *Brantley v. Nationwide Mut. Ins. Co.*, C.A. No. RDB-07-1322, 2008 WL 2900953 (D. Md. July 22, 2008) in support of his argument. However, in *Brantley* there was evidence that the employer knew the extent of the employee's medical complications, which would have qualified her for FMLA leave, but denied her protected leave anyway and terminated her employment for job abandonment. 2008 WL 2900953, at *12. There was also evidence that the employer made a negative comment about the extent of the plaintiff's complications and absences, commenting that "people get pregnant all the time." *Id*. Based on this evidence, the court ruled that it was for a jury to decide if the employer's stated reason for termination was false. *Id*. The undersigned agrees with the defendant that these facts are not comparable to the instant case where the plaintiff solely attempts to establish pretext based on his disagreement with the defendant's view of the termination event.

It is clear from the case law in this district and circuit that the employer's honest belief is appropriately viewed at the summary judgment stage. *See, e.g., Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007) (concluding that no reasonable juror could conclude the decisionmaker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decisionmaker] did not honestly believe that the threats were made" and noting that "'[i]t is the perception of the decisionmaker which is relevant.'") (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435 (4th Cir.1998)); *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722–23 (4th Cir.2002) ("'[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse employment action].'") (quoting *DeJarnette*, 133 F.3d at 299). Here, the plaintiff has failed to demonstrate that the defendant's stated reason for terminating his employment "is unworthy of credence to the extent that it will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Dugan*, 293 F.3d at 723 (citation omitted).

The plaintiff argues that the court should analyze his FMLA retaliation claim

17

under the mixed-motive framework (doc. 23, pl. resp. m.s.j. at 16-17). As noted by the defendant, the plaintiff relies on a case from the United States Court of Appeals for the Sixth Circuit to support the availability of this framework in an FMLA retaliation case (*id.*). However, the United States Court of Appeals for the Fourth Circuit has never addressed whether the mixed-motive framework applies in FMLA cases. *See Burgess v. JHM Hotels, LLC*, C.A. No. 6:08-3919-HMH-BHH, 2010 WL 1493132, at *6 (D.S.C. Apr. 13, 2010) ("Further, there is a serious question as to whether the mixed-motive theory of FMLA retaliation survives the Supreme Court's recent decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).") (internal citations omitted).

Moreover, even assuming the mixed-motive analysis applies, the plaintiff fails to establish how he satisfies the requirements as he has not and cannot show that his FMLA leave was a motivating factor in the termination decision. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The plaintiff has not submitted any evidence that the protected trait "'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). Regardless of the method of analysis employed, "'[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 153). The plaintiff's conclusory argument that the court should apply the mixed-motive analysis is not sufficient to invoke this analysis. *See Ferguson v. Waffle House, Inc.*, 18 F. Supp.2d 705, 718 n.10 (D.S.C. May 8, 2014) (noting that the court is not required to analyze the case under a mixed-motive framework where the parties fail to analyze the case under a mixed-motive analysis) (citing *Hopes v. Roche*, No. 04–2963, 2005 WL 1812820, at * 6 n. 2 (D. Md. Aug. 2, 2005)).

The plaintiff has failed to present evidence upon which a reasonable juror could find that the defendant terminated his employment "because of his serious health condition of which Plaintiff had taken qualifying leave, and/or because he intended to take leave that was protected by the FMLA in the near future" (doc. 14, amend. comp. ¶ 30). Accordingly, summary judgment should be granted as to the plaintiff's claim of violation of the FMLA.

### *ADA*

The plaintiff further alleges that the defendant terminated his employment "because of his disability and/or being regarded as having a disability" in violation of the ADA (doc. 15, amend. comp. ¶ 20). The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The *McDonnell Douglas* scheme of proof applies to claims under the ADA. *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Accordingly,

> [T]he plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

*Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

To establish a *prima facie* claim of disability discrimination under the ADA, the plaintiff must prove (1) he had a disability as defined by the ADA; (2) he was a "'qualified individual,'" i.e., able to perform the essential functions of his job with or without reasonable accommodation; and, (3) his employer took an adverse action against him on account of his disability. *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 443 (4th Cir. 2013) (quoting

42 U.S.C. § 12112(a)). "The ADA provides three avenues of establishing the existence of a disability: '(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Id*. (quoting 42 U.S.C.. § 12102(1)).

The defendant argues that the plaintiff cannot establish the elements of a *prima facie* case of discrimination under the ADA.  However, for purposes of this motion, the undersigned will assume that the plaintiff can establish a *prima facie* case.  As discussed above with regard to the FMLA claim, the defendant has proffered a legitimate, nondiscriminatory reason for terminating the plaintiff's employment, and the plaintiff has failed to show evidence that this reason was pretext for discrimination.  For these same reasons, summary judgment should be granted on the plaintiff's ADA claim.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing,

IT IS RECOMMENDED that the defendant's motion for summary judgment (doc. 21) be granted.

IT IS SO RECOMMENDED.

                                        s/ Kevin F. McDonald
                                        United States Magistrate Judge

January 28, 2015
Greenville, South Carolina